UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| ANGELA NETTLES,<br><br>    Plaintiff,<br> vs.<br><br>HILTON WORLDWIDE, INC., a business corporation incorporated in the State of Delaware; RIVER GREENWAY HOSPITALITY, LLC d/b/a/ HILTON GARDEN INN, a limited liability company in the State of South Dakota; MAIN AND MAIN, L.L.C., a limited liability company in the State of South Dakota; DOES 1 through 10; ROE CORPORATIONS 11 through 20; and ABC LIMITED LIABILITY COMPANIES 21 through 30,<br><br>    Defendants,<br> and<br><br>MAIN AND MAIN, L.L.C., a limited liability company in the State of South Dakota; HILTON WORLDWIDE, INC., a business corporation incorporated in the State of Delaware; RIVER GREENWAY HOSPITALITY, LLC d/b/a/ HILTON GARDEN INN, a limited liability company in the State of South Dakota,<br><br>    Cross-Claimants,<br> vs.<br><br>LLOYD CONSTRUCTION COMPANY, a business corporation in the State of South Dakota; | 4:18-CV-4102-LLP<br><br><br>**MEMORANDUM OPINION AND ORDER DENYING MOTION TO EXCLUDE EXPERT TESTIMONY AND DENYING MOTION FOR SUMMARY JUDGMENT** |

1

| | |
|---|---|
| Cross-Defendant and Third-Party Plaintiff<br><br>vs.<br><br>HEARTLAND GLASS COMPANY, LLC, a business corporation in the State of South Dakota,<br><br>Third-Party Defendant. | |

Pending before the Court are a Motion for Summary Judgment (Doc. 58) and Motion to Exclude Expert Testimony of Michael Panish ("Panish") (Doc. 62) filed by Defendant Hilton Worldwide, Inc.; River Greenway Hospitality, LLC, d/b/a/ Hilton Garden Inn; Main and Main, LLC; Does 1-10; Roe Corporation 11-20; and ABC Limited Liability Companies 21-30 (collectively hereinafter the "the Hilton Defendants"). For the following reasons, the Motion to Exclude Expert Testimony is denied and the Motion for Summary Judgment is denied.

## BACKGROUND

### A. Facts

On August 28, 2015, Angela Nettles ("Mrs. Nettles") was staying at the Hilton Garden Inn ("Hotel") located in Downtown Sioux Falls. (Doc. 60, ¶ 1; 67, ¶ 1). Also staying with Mrs. Nettles at the Hotel on August 28, 2015, was her husband, Brian Nettles ("Mr. Nettles), and her daughter, Lilly Nettles ("Daughter Nettles") (collectively referred to as "the Nettles Family"). (Docs. 60, ¶ 2; 67, ¶ 2). The Nettles Family was staying in a room at the Hotel that was outfitted with a sliding glass barn door, which separated the master bedroom from the living room. (Docs. 60, ¶ 3; 67, ¶ 3). The glass barn door weighed approximately 117 pounds. (Docs. 60, ¶ 4; 67, ¶ 4). Two vertical connectors with rollers were connected to the top of the glass barn door. (Docs. 60, ¶ 5; 67, ¶ 5). The two vertical connectors on the top of the glass barn door connected to a horizontal bar on the wall of the Hotel room by means of the two rollers sitting on the horizontal bar. (Docs. 60, ¶ 6; 67, ¶ 6).

At some point during the late evening on August 28, 2015, Mrs. Nettles went to open the sliding glass barn door in the Hotel room to leave the master bedroom and enter the living room.

(Doc. 60, ¶ 7; 67, ¶ 7). When Mrs. Nettles went to open the sliding glass barn door, the door felt stuck, so she gave it a few wiggles back and forth. (Doc. 60, ¶ 8; 67, ¶ 8). Mrs. Nettles wiggled the glass barn door with only one hand and did not brace her legs or use her whole body to wiggle the door. (Docs. 60, ¶ 9; 67, ¶ 9). The second or third time Mrs. Nettles wiggled the door, the two vertical connectors that were connected to the top of the glass barn door somehow came off the horizontal bar. (Docs. 60, ¶ 10; 67, ¶ 10). The glass barn door and vertical connectors and rollers fell forward and the bottom of the door took the legs out from under Mrs. Nettles as the door and Mrs. Nettles fell to the ground ("the Incident"). (Docs. 60, ¶¶ 11-12; 57, ¶¶ 11-12). This glass barn door had been installed in the sole Presidential Suite in the Hotel and was thus the only one of its type at the Hotel where Mrs. Nettles was staying.

The Hotel had been open less than two years at the time of the Incident. (Docs. 60, ¶ 19; 67, ¶ 19). Justin Kallas ("Mr. Kallas") was employed as the general manager of the Hotel when it opened and at the time of the Incident. (Docs. 60, ¶ 20; 67, ¶ 20). Paul Floren ("Mr. Floren") was hired as the lead engineer of the Hotel in June of 2015 and was employed in that capacity at the time of the Incident. (Docs. 60, ¶ 22; 67 ¶ 22). Prior to the Incident, the Hotel room with the glass barn door in it had been used hundreds of times. (Docs. 60, ¶ 28; 67, ¶ 28). Neither Mr. Kallas, Mr. Floren, nor the Hilton Defendants were aware of any issues with the glass barn door and no issues had been brought to their attention by either Hotel guests or by housekeeping. (Docs. 60, ¶¶ 21, 24, 26-27, 29; 67, ¶¶ 26-27, 29). When Mrs. Nettles used the glass barn door in the Hotel room prior to the Incident, she experienced no problems with the door. (Docs. 60, ¶ 29; 67, ¶ 29).

No preventative maintenance had been conducted on the glass barn door system from the time it was installed until the time of the Incident. (Doc. 67, ¶ 8; Doc. 61-5, Floren Dep. 34:23-35:20). Justin Kallas, the manager for the Hilton prior to its opening to the public and at the time of the Incident testified that when he would occasionally conduct a random inspection of the glass barn door, he would operate it as a guest would to make sure that it moved freely. (Doc. 61-4, Kallas Dep., 11:5-16; 72-1, Kallas Dep. 28:1-17). Mr. Panish stated that a proprietary wrench must be used to properly tighten most of the door components that make up the hanging hardware for this system. (Doc. 63-1). Mr. Floren, who worked as the lead engineer for Hilton beginning in June 2015 (approximately 2-3 months prior to the Incident) until approximately February 2018, testified that he was not aware of any specific spanner wrench that had been purchased for the

3

glass barn door, nor had ever used a spanner wrench to tighten any of the door's components. (Doc. 61-5, Floren Dep. 7:20-24, 12:16-23, 23:24-24:3; 35:12-20).  Mr. Floren testified that Hilton had no maintenance schedule for the 117-pound glass door, that he had never performed any maintenance on it, but would inspect all rooms on a biannual basis.  (Doc. 61-5, 17:1-18-21; 35:5-11).  Biannual inspections of the doors included making sure the doors closed and locked correctly. (Doc. 61-5, Floren Dep. 18:6-21).

### B. Procedural History

On August 20, 2018, Mrs. Nettles filed a Complaint against Hilton Worldwide, Inc.; River Greenway Hospitality, LLC d/b/a Hilton Garden Inn; Main and Main, L.L.C.; Does 1-10; Roe Corporations 11-20; and ABC Limited Liability Companies 21 through 30.  The Hilton Defendants filed crossclaims against Lloyd Construction Company who filed a third-party complaint against Heartland Glass Company, LLC.

On December 1, 2020, the Hilton Defendants filed a Motion to Exclude Expert Testimony of Michael Panish (Doc. 62) and a Motion for Summary Judgment (Doc. 58).  These motions have been fully briefed by the parties and are ready for disposition.

## DISCUSSION

### I. Motion to Exclude

Pending before the Court is a Motion to Exclude Expert Testimony of Mrs. Nettles's expert, Michael Panish ("Mr. Panish") that was filed by the Hilton Defendants.

### A. Background

Mr. Panish conducted his inspection of the replacement glass door on July 15, 2019 (approximately 5 months after the inspection by the Hilton Defendant's expert and approximately 4 years after the Incident).  In his report, he detailed several observations, although none of them were documented photographically.  Mr. Panish stated that the hanging components that make up the point of attachment between the glass panel and the hanging rail were found to be loose.  He stated that there is a proprietary wrench that must be used to properly tighten most of the door components that make up the hanging hardware for the door system.  Mr. Panish stated that he removed the loose parts and found that no thread locking agent was ever applied to the threads of

the retaining screws.  Mr. Panish stated that he observed the glass panel to be travelling in an incorrect position, such that the door impacted a wooden floor molding that is used to cap off the wooden base molding which placed stress upon the sliding glass panel every time the glass door impacted the floor molding.  Mr. Panish stated that the hanging rail and all components observed were misadjusted and did not limit the travel of the glass door panel to avoid impact with the surrounding walls.  Mr. Panish stated that these defects could have been easily identified by observing paint wear and physical marks on the glass door edge.  Mr. Panish opines that these impact points with the glass on the molding and the wall will "create tension and cause spontaneous shattering of the tempered glass."  Mr. Panish also opines that it was more probable than not that no plan or policy was in place to inspect and maintain the glass barn door and that he had not been provided with any physical proof or documentation of regular inspections by the hotel maintenance or staff.

### B. Analysis

The Hilton Defendants have moved to exclude the expert testimony of Mr. Panish as unreliable, speculative, and irrelevant.  The Hilton Defendants have two primary arguments in support of their motion to exclude.  First, the Hilton Defendants argue that there is no evidence in the record suggesting that the alleged dangerous conditions observed by Mr. Panish 4 years after the Incident were present before or at the time of the Incident.  Second, the Hilton Defendants argue that Mr. Panish's opinions are "untethered . . . from the actual evidence of the incident" and "squarely inconsistent with the facts of the incident." (Doc. 63 at 5-6, 8).  Mr. Panish opines that the door's misalignment and improper contact with the surrounding walls and wood molding in the traveling position may cause the door to spontaneously shatter.  However, the Hilton Defendants point out that according to Mrs. Nettles's testimony, the door did not spontaneously shatter, but rather, the rollers attached to the door detached from the horizontal bar and the door shattered when it fell to the ground and she on top of it. (Doc. 63 at 8).  Also, the Hilton Defendants points out that the door was not in the travelling position, but according to Mrs. Nettles's testimony, was in the closed position. (Doc. 63 at 6).

>Federal Rule of Evidence 702 provides:
>
>A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise, if:

5

>    (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>    (b) the testimony is based on sufficient facts or data;
>    (c) the testimony is the product of reliable principles and methods; and
>    (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. When considering expert testimony, a district court must ensure that it is "both reliable and relevant." *Barrett v. Rodia, Inc.*, 606 F.3d 975, 980 (8th Cir. 2010) (citation omitted). To satisfy the reliability requirement for admission of expert testimony, the party offering the expert testimony must show that the expert is qualified to render the opinion and that the testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline." *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999); *id.* To satisfy the relevance requirement for the admission of expert testimony, the proponent must show that the expert's reasoning or methodology was applied properly to the facts at issue. *Barrett*, 606 F.3d at 980.

"Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir.2006). "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (citation omitted). However, an expert's opinion must be excluded if it "is so fundamentally unsupported that it can offer no assistance to the jury." *Id.* at 929–30 (citation omitted). The proponent of the expert testimony bears the burden of proving its admissibility by a preponderance of the evidence. *Lauzon v. Senco Products, Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (citing *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 592 (1993)).

Mr. Panish will be permitted to testify to his observations regarding the installation and operation of the glass barn door, and his opinions derived therefrom. It is important to note that the opinions of the experts for both sides were formed based on observations of the replacement glass door conducted 3.5-4 years after the Incident. There is no evidence in the record that the hanging rail ever needed to be readjusted or replaced after the Incident, only that a new glass barn door was ordered, and the Court thus finds that the jury may reasonably infer that any maladjustment in the hanging rail and travel of the glass barn door was present at the time of the Incident. It is unclear from the record whether new vertical attachments and rollers were ordered

for the replacement door or whether they were the ones originally attached to the glass barn door that injured Mrs. Nettles.  Regardless, the Court finds that an inference can reliably be made by a jury that the loose components observed by Mr. Panish were also present at the time of the Incident.  Mr. Panish stated in his report that numerous components of the door system require positive attachment for safe operation and that regular and routine inspections by a trained engineer or maintenance staff is vital to properly maintaining the door system and that a proprietary wrench must be used to properly tighten most of the door components that make up the handing hardware for this system.  The evidence suggests that Hilton did not own or use the proprietary wrench to tighten any of the door system's components either in the 2 years before the Incident or in the 4 years after the replacement door was installed.  The evidence also shows that any inspections of the glass barn door were cursory and that no preventative maintenance had been performed on the door prior to or after the Incident.  Justin Kallas, the manager for the Hilton prior to its opening to the public and at the time of the Incident, testified that when he would occasionally conduct a random inspection of the glass barn door, he would operate it as a guest would to make sure that it moved freely.  Mr. Floren, who worked as the lead engineer for Hilton beginning in June 2015 (approximately 2-3 months prior to the Incident) until approximately February 2018, testified that Hilton had no maintenance schedule for the 117-pound glass door, that he had never performed any maintenance on it, but would inspect all rooms biannually.  Biannual inspections of the doors included making sure they closed and locked correctly.

The Court does not find that Panish's opinions are "so fundamentally unsupported that [they] can offer no assistance to the jury."  *See Bonner*, 259 F.3d at 929-30.  The Hilton Defendants may examine the factual basis for Mr. Panish's opinions on cross-examination.  The Hilton Defendants' own expert will be able to testify that during his inspection of the replacement glass barn door approximately 3.5 years after the Incident, he observed no loose components in the door system and had measured and documented that the hanging rail was level.

## II. Summary Judgment Motion

In her Complaint, Mrs. Nettles alleges that the "sliding glass barn door was a dangerous condition which Defendants should have remedied and/or warned [Mrs. Nettles] of prior to [her] injury." (Doc. 1, ¶ 8).  Mrs. Nettles further alleges that "Defendants failed to exercise due care in

the maintenance of the hotel room and keeping the hotel room in a reasonably safe condition." (Doc. 1, ¶ 8).

The Hilton Defendants have filed a Motion for Summary Judgment. In its Memorandum in Support of its Summary Judgment Motion, the Hilton Defendants argue that it did not have a duty to take any measures to protect Mrs. Nettles against a risk that the glass barn door would pop off the horizontal rail and fall to the ground because such risk was not foreseeable under the surrounding facts and circumstances. (Doc. 59).

"Negligence is the breach of a duty owed to another, the proximate cause of which results in an injury." *Larmon v. United* States, 200 F.Supp.3d 896, 903-04 (D.S.D. 2016) (quoting *Janis v. Nash Finch Co.*, 780 N.W.2d 497, 500 (S.D. 2010)). "The existence of a duty owed by the defendant to the plaintiff, which requires the defendant to conform to a certain standard of conduct in order to protect the plaintiff against unreasonable risks, is elemental to a negligence action." *Id.* at 904. Typically, "the existence of a duty, i.e., whether a relation exists between the parties such that the law will impose upon the defendant a legal obligation or [require the defendant to engage in] reasonable conduct for the benefit of the plaintiff, is to be determined by the court." *Norman v. Ritter-Rittenhouse Corp.*, Civ. No. 08-4189, 2010 WL 3282619, at *2 (D.S.D. Aug. 19, 2010) (quoting *Cuppy v. Bunch*, 214 N.W.2d 786, 789 (S.D. 1974)); *Janis*, 780 N.W.2d at 500.

"As a general rule, the possessor of land owes an invitee or business visitor the duty of exercising reasonable or ordinary care for the benefit of the invitee's safety, and the possessor is liable for the breach of such duty." *Janis*, 780 N.W.2d at 501 (citation omitted). The duty to exercise reasonable or ordinary care is "two-fold" and includes the duty "to warn of concealed, dangerous conditions known to the landowner and to use ordinary care in active operations on the property." *Id*. at 501. The requirement that a landowner know[1] of the dangerous condition on his property limits his duty to warn, but does not constrain his more general duty to keep his property reasonably safe. *Id.* at 501-02.

---

[1] The knowledge required to impose a duty to warn may be actual or constructive. *See Parker v. Casa Del Rey-Rapid City, Inc.*, 641 N.W.2d 112, 116 (S.D. 2002) (quoting *Kryger v. Dokken*, 386 N.W.2d 481, 483 (S.D. 1986) (stating that landowners must warn of a dangerous condition only if the condition existed for a time long enough to "justify the inference that he had knowledge of its existence.")).

8

In their motion for summary judgment, the Hilton Defendants argue that the risk that the door would fall was not foreseeable. A foreseeable risk of harm is one that would be anticipated by a reasonable person. *Id.* at 502-03. "A landowner owes a duty of reasonable or ordinary care to entrants on his property only when all the surrounding facts and circumstances, including the knowledge he possesses, indicate that the risk of harm was foreseeable." *Id.* at 504-05. In *Janis v. Nash Finch Co.*, during the month of January, the plaintiff walked through the open sliding glass door into the Prairie Market entryway in Rapid City, South Dakota (owned and operated by Nash Finch Company), stepped onto a commercial rug on the tile floor, and fell when the rug slipped under his feet. *Id.* After his fall, it was discovered that a patch of ice had been hidden under the rug. *Id.* at 500. Although it was not clear how the patch of ice formed under the rug, it was suggested at trial that floor maintenance employees had placed the rug on the wet tile floor during their overnight cleaning and that the water under the rug froze as a result of the cold temperature. *Id.* at 499-500. It was also suggested that moisture tracked into the store by customers and employees accumulated under the rug and froze. *Id.* at 500.

The plaintiff sued Nash Finch Company for negligence. The defendant had argued that it did not owe a common law duty of reasonable and ordinary care to the plaintiff because it had no knowledge of the presence of the ice patch since it had been concealed by the rug and since no prior similar incidents had occurred on the premises. *Id.* at 501, 503. On appeal, the South Dakota Supreme Court concluded that the defendant owed the plaintiff a duty to use reasonable and ordinary care to make its premises safe for its business invitees because "[i]t was foreseeable that a rug placed on a wet tile floor immediately inside a frequently opened door on a January day might involve an unreasonable risk of harm." *Id.* at 504.

In their concurrence, Justices Zinter and Konenkamp acknowledged that although the majority's opinion was limited to discussing the question of foreseeability, the existence of a duty of care arising from the failure to discover concealed or unknown conditions does not emanate solely from the foreseeability of the risk of harm as discussed by the court. *Id.* at 505-06. The concurrence stated that the duty is also dependent upon a second question: whether the occupier knew of the condition or by the exercise of reasonable care would discover the condition that caused the harm. *Id.* at 506. In their concurrence, the Justices acknowledged that the South Dakota Supreme Court had recognized, by its repeated citation to the Restatement (Second) Torts § 343

(1965), that the elements of knowledge of the condition, and foreseeability of the risk, are separate inquiries. *Id.* at 506. Section 343 provides:

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he:
>
> (a) Knows or by the exercise of reasonable care would discover the condition, and should realize it involves an unreasonable risk of harm to such invitees, and
> (b) Should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
> (c) Fails to exercise reasonable care to protect them against the danger.

*Janis*, 870 N.W.2d at 502 (quoting Restatement (Second) of Torts § 343)). "Accordingly, under the common law restated in subsection (a), a possessor's duty of care to an invitee arises if: (i) the possessor knows or by the exercise of reasonable care would discover the condition, *and* (ii) the possessor should realize that the condition involves an unreasonable risk of harm to invitees." *Id.* (citing Restatement (Second) of Torts § 343).

The concurrence in *Janis* stated that the authorities generally recognize that a duty arises when there has been a failure to exercise due care in inspecting for or discovering a previously unrecognized condition that poses an unreasonable risk of harm. *Id.* at 506-07. They noted comment b to section 343 which provides:

> [A]n invitee enters upon an implied representation or assurance that the land has been prepared and made ready and safe for his reception. He is therefore entitled to expect that the possessor will exercise reasonable care to make the land safe for his entry, or for his use for the purposes of the invitation. He is entitled to expect such care not only in the original construction of the premises, and any activities of the possessor or his employees which may affect their condition, but also in inspection to discover their actual condition and any latent defects, followed by such repair, safeguards, or warning as may be reasonably necessary for his protection under the circumstances.

*Id.* at 507 n.3 (quoting Restatement (Second) Torts § 343 cmt. b). The Justices wrote that "the possessor of business premises 'is under an affirmative duty to protect [invitees], not only against dangers of which he knows, but also against those which with reasonable care he might discover.'" *Id.* at 507 (quoting Prosser and Keeton on Law of Torts § 61, at 419). The Justices concluded that in determining whether a duty exists, courts should determine whether the defendant, "by exercise of reasonable care, would have discovered the condition, and whether, under all the facts and

circumstances, it presented an unreasonable risk of harm that [the defendant] should have realized." *Id.*

In *Pierce v. City of Belle Fourche*, an airplane owner brought a negligence action against the city after his airplane was damaged at the municipal airport during a windstorm. 624 N.W.2d 353 (S.D. 2001). There, the court found that the risk of harm (an airplane blowing away when worn tie down ropes broke during a South Dakota windstorm) was foreseeable. *Id.* at 355-56. The court rejected the City's argument that imposing a duty of care "in selecting the ropes, fabricating the tie-downs and detecting and replacing worn tie-downs" rendered the City an insurer of the safety of the plaintiff's airplane. *Id.* at 356. The City had argued that it could not tell that the tie down ropes in question were worn out because they did not appear to be defective and there was no way to tell if a rope was weakened other than to break it to see if it was weak. 624 N.W.2d at 356. The South Dakota Supreme Court stated that "[a] duty is not less a duty because it is difficult" and that the "City could have established a regular schedule of testing or developed a regular schedule of replacement." *Id.*

Mrs. Nettles's expert, Mr. Panish, states that there are numerous components associated with the glass barn door system that "require routine and dedicated observation and maintenance" in order to function properly. The installation and care manual for the glass barn door is not in the summary judgment record so it is unclear at this point what preventative maintenance was recommended or required by the manufacturer. Regardless, the Court finds that it is foreseeable that a 117-pound sliding glass barn door with various components, operated by staff and guests over multiple years without any close inspection of the components or preventative maintenance (including tightening of components with the proprietary spanner wrench), may disfunction in the manner experienced by Mrs. Nettles. The Court further concludes that by exercising reasonable care in inspecting and maintaining the glass barn door system, Hilton should have discovered any of the defects in the installation and/or operation of the door that were observed by Mr. Panish to have posed a risk of harm to guests. Hilton therefore had a duty to use reasonable or ordinary care in making its premises safe for business invitees such as Mrs. Nettles. Questions of fact exist and will be evaluated by a jury at trial as to whether Hilton breached this duty and if so, whether such breach was the proximate cause of Mrs. Nettles's injuries.

Accordingly, it is hereby ORDERED that:

1) the Hilton Defendants' Motion to Exclude the Expert Testimony of Mr. Panish (Doc. 62) is DENIED; and

2) Hilton's Motion for Summary Judgment (Doc. 58) is DENIED.

Dated this 4th day of May, 2021.

BY THE COURT:

_____
Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK

_____